**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 13** |
| | ) | |
| **JEAN K. MITCHELL,** | ) | **CASE NO. 12-70856** |
| | ) | |
| Debtor. | ) | |

_____

## MEMORANDUM DECISION

      This case is before the Court upon the Chapter 13 Trustee's motion to dismiss the case or convert it to Chapter 7 on the ground that the amount of the Debtor's unsecured, liquidated and noncontingent debt on the date this case was filed makes her ineligible to proceed under Chapter 13 of the Bankruptcy Code.[1]  For the reasons set forth below, the Court will grant the Trustee's motion and dismiss the case, but will stay that ruling for a period of fourteen days to permit the Debtor to convert her case to a chapter for which she is eligible.

## FINDINGS OF FACT

      The Debtor, Jean K. Mitchell, filed for Chapter 13 relief on May 2, 2012.  At that time the Debtor did not file any schedules with her petition.  Two weeks later, on May 16, 2012, the Debtor filed Schedules A-J to her petition. The section 341 meeting of creditors was held on May 24, 2012.  On June 4, 2012, the Chapter 13 Trustee filed a Report and Show Cause for Dismissal or Conversion to Chapter 7.  Among a number of issues raised by that Report the Trustee asserts that the Debtor is ineligible for Chapter 13 relief pursuant to 11 U.S.C. § 109(e) due to the amount of her unsecured debt.  At the first confirmation hearing, held on June 20,

_____

  [1] 11 U.S.C. § 109(e).

2012, confirmation was denied and the Debtor was given fourteen days to file an amended plan.

On June 29, 2012, the Debtor filed an Amended Plan and Amended Schedule F.  The Debtor's

original Schedule F listed a total of $64,582.73 for general unsecured debt, which most notably

included an "Installment Loan" of Highlands Union Bank ("HUB") in the amount of $21,008, a

note to Jean W. Kreger in the amount of $35,000, and a note to Robert and Nicki Jenkins in the

amount of $3,500.  None of that debt was listed as contingent, unliquidated, or disputed.  The

amended version of Schedule F makes the following changes to the original version: the

"Installment Loan" to HUB in the amount of $21,008 has been removed; the claim of Jean W.

Kreger in the unchanged amount of $35,000 is now shown as contingent, unliquidated, disputed,

and "probably barred by statute of limitations;" and the claim of Robert and Nicki Jenkins is now

designated contingent, unliquidated, disputed, and "barred by statute of limitations."  The total

amount of the general unsecured debt that is not in dispute and is listed in both the original and

revised versions of Schedule F is $5,074.73.

       The Debtor's Amended Chapter 13 Plan filed on June 29, 2012 does not propose

to surrender any property to creditors but does propose that a property described as the "Cabin,"

which is one of the three parcels encumbered by two mortgages in favor of HUB and a third in

favor of Johnson County Bank ("JCB"), will be sold to the Debtor's children for the sum of

$40,000 to pay off the second lien in favor of HUB.  The Plan further proposes to strip off the

third mortgage obligation to JCB on the basis that the debt is wholly unsecured; to pay a third

obligation (purportedly secured by an interest in a partnership) to HUB described as an

installment loan in the amount of $21,000 with interest at 4.75% per annum in an unspecified

number of monthly payments of $180.00 each; to pay the regular contract payment specified to

2

be $1,501 per month upon the first mortgage obligation to HUB; and lastly to make an estimated

distribution to general unsecured creditors of approximately 1% although the Debtor estimates

that such creditors would receive a distribution of approximately 5% in a Chapter 7 liquidation.

On December 5, 2012, the Debtor filed Amended Schedules D, E, and H.  These

amended schedules contain the following changes from the representations made in their original

versions:  On the Debtor's original Schedule D, she listed two debts to HUB and one to JCB.

The same three parcels of property were noted as security for all three debts:  a .619 acre lot and

a .53 acre lot both located at Walden Road in Abingdon (collectively, the "residence property"),

and 1 acre of land located at Mongle Springs (the "Cabin").  The aggregate total value of this

improved real property was noted as $218,700.  The first mortgage debt to HUB was scheduled

in the amount of $217,029 and the second in the amount of $39,997 for a total obligation to that

bank of $257,026.  The Debtor listed the debt to JCB in the amount of $323,853.  This latter

obligation was listed as contingent, unliquidated, and entirely unsecured.  While the Debtor did

not specifically list any unsecured debt to HUB on this schedule, the unsecured portion of the

second mortgage debt owing to HUB is $38,326.  By adding that to the JCB scheduled

indebtedness, the total of unsecured debt represented on the Debtor's original Schedule D is

$362,179.  The amended Schedule D adds a third claim to HUB in the amount of $22,000

secured by the Debtor's undivided one-half interest, which she valued at $96,500, in a 1/13th

share of a partnership known as Kingsport Ocean Club and a debt owed to the Washington

County Treasurer of $12,246 secured by a house and the .53 acre parcel valued at $152,800.  The

latter property is one of the three parcels subject to the two secured claims of HUB and the claim

of JCB.  Thus, the claim of the Washington County Treasurer increases the unsecured debt to

3

HUB by $12,246.  The total of unsecured debt represented on the Debtor's Amended Schedule D is $374,425.

In the Debtor's original Schedule E, she listed two obligations, one to the Town of Abingdon in the amount of $5,838 and one to the Treasurer of Washington County for $20,535. Both these claims were marked as entitled to priority.  The amended version of Schedule E removes the claim to the Treasurer of Washington County, which as already noted has been added to Amended Schedule D, and also reduces the remaining debt owed to the Town of Abingdon to $5,320.  The amended version of Schedule H adds the Debtor's husband, James E. Mitchell, as a co-debtor upon the debt owing to Washington County Treasurer.  Its original version had listed him as co-debtor only upon the debts owing to HUB, Jean W. Kreger, JCB, and Robert and Nicki Jenkins.

On September 19, 2012, the Debtor filed an Objection to Claim #10 of Robert and Nicki Jenkins.  This was a debt owed to the Debtor's sister-in-law and the latter's husband and the objection was resolved in favor of Mr. and Mrs. Jenkins through this Court's decision rendered on November 16, 2012, which allowed the claim in the amount of $28,097.[2]  The Debtor filed a Notice of Appeal to the District Court on November 26, 2012 and subsequently filed a Motion to Stay Pending Appeal.  The Trustee argues that a stay is not necessary and that it would prevent the Court from dealing with the issue of eligibility.[3]  The Court will deal

---

[2] The Debtor scheduled this debt in the amount of $3, 500 but the Jenkins filed a proof of claim in the amount of $35,096.41, which included both the original principal amount of $15,000 and compound interest thereon at the rate of 5% specified in the note dated November 15, 1994 which was attached to the proof of claim.  The Court allowed the principal and simple interest.

[3] On December 4, 2012, Mr. and Mrs. Jenkins filed a withdrawal of their claim.

4

separately with that motion.

   Both HUB and JCB have filed proofs of claim in this case.  The former's proofs of claim filed on June 15, 2012 set forth that it was owed $225,221.66 and $40,718.92 on the first and second mortgage loans,[4] respectively, on the petition date.  Attached to the first proof of claim is a Note dated December 10, 1998, providing for payment in monthly installments of $1,602.04 until the maturity date of December 10, 2028.  A Deed of Trust and Note Modification Agreement is also attached to the proof of claim which shows a monthly payment of $1,501.07 commencing on January 10, 2010.  Such note does not contain any indication that the obligation to pay is subject to any contingency.  The second proof of claim was for an equity line agreement.  The agreement sets forth that payment is due on June 27, 2013, if not paid earlier, and requires a minimum monthly payment of $50 or the amount listed on the statement,

---

   [4] On these two proofs of claim, HUB designated that the basis for perfection was a "Deed of Trust, Assignment of Equitable Life Insurance and Assignment of Partnership Interest in Kingsport Ocean Club."  Both proofs of claim list the value of the property as $315,200.  It appears that HUB did not value the Equitable Life Insurance policy, which the assignment form indicates is upon the life of Mr. Mitchell, as the indicated total value of the collateral is covered by the combined value of the partnership interest per HUB's third proof of claim and Debtor's Schedule B at $96,500 and the scheduled value of the real property of $218,700, which together equal $315,200.

   On the Debtor's original and Amended Schedule D the Debtor only lists the three parcels of property as security for these two loans.  The Debtor does not list a life insurance policy on Schedule B and presumably Mr. Mitchell owns the Equitable policy upon his own life.  On Amended Schedule D the Debtor added a third debt (the installment loan) to HUB that was previously on the original Schedule F.  Amended Schedule D represented that HUB's third loan was secured by the interest in Kingsport Ocean Club but did not make any change with respect to the indicated security for the bank's first two loans.  The Chapter 13 Trustee has filed objections to all three of the proofs of claim arguing that the bank did not have a valid security interest in the partnership.  The Trustee and counsel for HUB have requested the Court to defer consideration of these objections pending the Court's decision regarding the eligibility of the Debtor to proceed in Chapter 13 and an Order was entered on January 24, 2013 holding these objections in abeyance until the resolution of the current Motion.

whichever is larger.  The attached note does not contain any indication that the obligation to pay

it is subject to any contingency.  JCB's proof of claim, filed on May 22, 2012, is in the amount

of $327,876.47 and attaches as an exhibit a note dated July 3, 2008 in the original amount of

$386,580.62 bearing the purported signatures of the Debtor, her husband, James E. Mitchell,

Gerald Buckles and Karen Buckles.  The payment terms for this note provide that it is to be paid

in 180 monthly installments of $3,280.12 each, beginning on August 2, 2008.  Such note does

not contain any indication that the obligation to pay it is subject to any contingency.  The proof

of claim is also accompanied by a copy of a deed of trust purporting to have been signed by the

Debtor and her husband upon the three parcels of real property listed in Schedule D.


CONTENTIONS OF THE PARTIES

The Debtor filed a Memorandum of Law in support of her eligibility on

December 28, 2012, arguing that based on the Debtor's amended schedules she was eligible to

be in Chapter 13.  This was because, according to the Debtor, the debt to Ms. Kreger

should not be included in the eligibility calculation as the debt was listed as contingent,

unliquidated, and disputed on her Amended Schedule F.  The Debtor advocated that the amended

schedules should relate back to the filing of the petition and take the place of the original

schedules.  The Debtor also proposed that the Court should look at the proofs of claim filed and

the fact that Ms. Kreger never filed a proof of claim.  The Trustee filed a Memorandum of Law

on January 2, 2013, recommending that the Court adopt the so-called "snapshot approach."  This

analysis would require the Court to make a determination of a debtor's eligibility as of the time

of filing as determined from the original schedules.  The Trustee urged that eligibility is not

dependent upon the resolution of claims litigation or whether proofs of claim are actually filed.

A hearing was held on January 9, 2013, where both parties argued their respective positions. Counsel for the Debtor conceded that the "snapshot approach" was the majority view however he argued that you cannot apply one approach to every case. He continued that the difficulty with the "snapshot approach" is that none of the cases had dealt with amended schedules or the relation back doctrine and advocated that courts must complete a more detailed analysis in these types of situations. He contended that a debt should not be counted if there is a bona fide dispute as to the amount or the underlying liability. He argued that because there is no liability on the Kreger claim, due to the statute of limitations defense, it is unliquidated and because there was never a demand for payment on the promissory note, the debt is contingent. He also contended that because the claims bar date has passed and Mr. and Mrs. Jenkins have withdrawn their claim, the obligation to them should not be counted for the purpose of determining the Debtor's eligibility to file Chapter 13. The Court then took the Trustee's motion to dismiss under advisement.

CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984 and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia. Although a motion to dismiss or convert a case on the ground of debtor ineligibility for relief does not neatly fit within any of the specifically enumerated grounds set forth in 28 U.S.C. § 157(b)(2) delineating "core" bankruptcy proceedings, such grounds are

7

explicitly non-exclusive and it seems self-evident that the "core" jurisdiction to rule upon

"confirmation of plans" under § 157(b)(2)(L) by necessity must also provide the authority to

determine the preliminary issue of whether a debtor is even eligible to prosecute a case for relief

under the chapter of the Code in which the plan proposed for confirmation is filed.

The Bankruptcy Code sets requirements that a debtor must meet in order to seek

relief through one of the chapters of bankruptcy.  In order to participate in a Chapter 13 § 109(e)

requires:

> Only an individual with regular income that owes, on the date of the
> filing of the petition, noncontingent, liquidated, unsecured debts of
> less than $360,475, and noncontingent, liquidated, secured debts of
> less than $1,081,400. . . may be a debtor under chapter 13 of this title.

Based on the plain words of the statute, the critical point in time in determining how much

secured and unsecured debt a Chapter 13 debtor has is "the date of the filing of the petition."

According to this section a Debtor who on the filing date owes $360,475 or more in debt that is

noncontingent, liquidated, and unsecured, cannot be a debtor under Chapter 13.  In this case it

appears, based on the amounts listed in the Debtor's Amended Schedule D alone, taking into

account the documentation filed with JCB's proof of claim and the arguments advanced by the

parties in writing and orally at the January 9th hearing, that the Debtor has noncontingent,

liquidated, and unsecured debt of $374,425.  The Debtor's Amended Schedule E adds an

additional $5,320 and the uncontested portion of Debtor's Schedule F increases that sum by

$5,074.73.  This is a total of $384,819.73 in noncontingent, liquidated, unsecured debt reached

before addressing the debts to Ms. Kreger, Mr. and Mrs. Jenkins, or the debt to HUB that was

originally scheduled as unsecured.

8

BURDEN OF PROOF ON ISSUE OF DEBTOR ELIGIBILITY FOR CHAPTER 13

As is true for so many issues in bankruptcy, courts have come to differing

conclusions on the question of which party has the burden of proof when a chapter 13 debtor's

eligibility to file under that chapter is questioned.  It seems to be that in general the bankruptcy

debtor has the burden of proving eligibility to file under the statutory criteria.  *See generally*,

Hon. Barry Russell, *Bankruptcy Evidence Manual*, vol. 2, § 301.23 at p.247 (West, 2012-13

Edition), which cites many cases for the proposition, "The burden of proof on [eligibility] is on

the party filing the bankruptcy petition."  Judge Krumm (now retired) of this Court held to that

effect in the case of *Singer Asset Fin. Co., LLC v. Mullins* (*In re Mullins*), 360 B.R. 493, 498

(Bank. W.D. Va. 2007) (proof of being "an individual with regular income").  Judge Mayer of

the Eastern District of Virginia Bankruptcy Court has ruled to the same effect with specific

reference to the issue of whether a debtor's unsecured debt is within the statutory limit

prescribed in § 109(e).  *In re Bernick*, 440 B.R. 449, 450 (Bankr. E.D. Va. 2010).[5]  In *Bernick*

the debtor had a second deed of trust that was unsupported by equity.  The court held that when

the amount owing on that obligation was added to the other unsecured claims, the debtor was

over the eligibility cap.

Notwithstanding the dominance of the majority of court decisions on this point,

Judge Russell in his treatise at page 249 also notes two decisions holding that a party moving to

dismiss a chapter 13 case on the ground that the debtor's unsecured debt exceeds the statutory

ceiling bears the burden of proof to establish such contention:  *In re Horne*, 277 B.R. 712

---

[5] *Accord, In re Sappah*, No. 11-03129-8-SWH, 2012 WL 6139644 at * 4 (Bankr.
E.D.N.C. Dec. 11, 2012) (citing and following *Bernick*).

(Bankr. E.D. Tex. 2002), and *In re Baird*, 228 B.R. 324 (Bankr. M.D. Fla. 1999). This Court

concludes that the *Horne* and *Baird* rulings are mistaken and, conversely, that Judge Krumm's

decision in *Mullins* and Judge Mayer's decision in *Bernick* are correct. In addition to the

rationale detailed in those latter two decisions, this Court reaches that conclusion based on its

own rationale in the case of *In re Brown*, 244 B.R. 603 (Bankr. W.D. Va. 2000), where it

addressed a similar issue concerning the burden of proof on the value of collateral for

"cramdown" purposes in a Chapter 13 case. This Court determined that the debtor continued to

have that burden even when the issue came before the court on a creditor's objection to

confirmation, commenting that to rule otherwise would result "in a 'Catch 22' situation where

the debtor has the burden of proof to establish compliance with Chapter 13 requirements except

in those situations where a creditor actually denies that such requirements have been met." 244

B.R. at 611. The same logic applies here: the debtor has the burden of proof to establish

compliance with the statutory debt limits even though the issue comes before the court on a

trustee or creditor's motion to dismiss asserting that such a limit has been exceeded.


TREATMENT OF UNDERSECURED PORTIONS OF SECURED CLAIMS

The Debtor in this case has relatively little purely unsecured debt but she has a

great deal of debt which is nominally secured but by collateral having a value far less than the

total amount of that debt. The issue before the Court turns on how the non-secured portion of

that debt is treated for the purpose of the § 109(e) limitation on the permissible amount of

unsecured debt for Chapter 13 bankruptcy filers. Within the Fourth Circuit the answer to this

question has been settled for more than twenty years by the Court of Appeals's decision in the

10

case of *In re Balbus*, 933 F.2d 246 (4th Cir. Va. 1991). The appellate court held then that "[i]n determining whether [a Chapter 13 bankruptcy debtor] has less than [the permissible statutory ceiling amount] in unsecured debts under 11 U.S.C. § 109(e), the court must add the amount of unsecured debt and the amount by which secured creditors are undersecured." 933 F.2d at 247. At least in situations where the Chapter 13 debtor proposes to retain the property serving as collateral for a loan, the unsecured portion of the debt is determined by subtracting the amount of debt secured by lien against the property from the fair market value of such property. 933 F.2d at 250-51. It may be worth observing that the real dispute in *Balbus* on appeal was whether the fair market value of the property serving as loan collateral should be reduced by the estimated liquidation expense which the creditor would incur in realizing upon the value of its collateral. Chief Judge Ervin writing for the majority, over a dissent by Judge Murnaghan, ruled that such liquidation expense should not be taken into account in determining the extent to which the creditor's claim was unsecured when the debtor proposed to retain the property. Neither the majority nor the dissenting opinion questioned the premise that utilization of 11 U.S.C. § 506(a) was the correct way to determine the extent that a particular obligation was unsecured for the purpose of § 109(e) eligibility and apparently neither did the parties. Be that as it may, since the determination of that case the use of § 506(a) for the purpose of determining Chapter 13 eligibility pursuant to § 109(e) within the Fourth Circuit has not been disputed. That holding represents the majority of judicial decisions on this issue. "Through the inclusion of a § 506(a) analysis to define 'secured' and 'unsecured' in the § 109(e) context, a vast majority of courts, and all circuit courts that have considered the issue, have held that the unsecured portion of undersecured debt is counted as unsecured for § 109(e) eligibility purposes." *Scovis v.*

11

*Henrichsen* (*In re Scovis*), 249 F.3d 975, 983 (9th Cir. Cal. 2001).


TREATMENT OF JOINT DEBT

All of the mortgage debt is joint debt.  The obligations to HUB are owed by the

debtor and her husband.  The JCB obligation is owed jointly by Mr. and Mrs. Mitchell, Gerald

Buckles and Karen Buckles.  The Note held by HUB which is secured by the first mortgage

states explicitly,

> If more than one person signs this Note, each person is fully and
> personally obligated to keep all the promises made in this Note,
> including the promise to pay the full amount owed. . . .  The Note
> Holder may enforce its rights under this Note against each person
> individually or against all of us together.  This means that any one of
> us may be required to pay all of the amounts owed under this Note.

The Equity Line Agreement which is secured by the second mortgage lien to that bank sets forth,

"Even if you are signing this Agreement with any other person or persons, you are obligated to

pay the entire amount owing under it."  The JCB note includes in the terms of that obligation the

following language:

> **Obligations Independent**:  I understand that I must pay this note
> even if someone else has also agreed to pay it (by, for example,
> signing this form or a separate guarantee or endorsement).  You may
> sue me alone, or anyone else who is obligated on this note, or any
> number of us together, to collect this note. . . .  You may without
> notice release any party to this agreement without releasing any other
> party.  If you give up any of your rights, with or without notice, it
> will not affect my duty to pay this note.

It is clear that on each of these debts the Debtor is individually liable for the entire amount owed

on the respective obligation.  Indeed the Debtor appears to acknowledge this reality as she has

scheduled the full amounts owing on these various debts in both versions of Schedule D.  The

12

bankruptcy and appellate courts across the board seem to take the view that the full amounts

owing on joint obligations are treated as the debt of each borrower for the purpose of

determining § 109(e) eligibility for Chapter 13.  *In re Marchetto*, 24 B.R. 967 (B.A.P. 1st Cir.

Mass. 1982) (joint obligation of a husband and wife on a mortgage would be counted in full for

eligibility purposes in the female debtor's individual Chapter 13 case, which rendered her

ineligible); *In re Geller*, 96 B.R. 564, 568 (Bankr. E.D. Pa. 1989) (follows *Marchetto); In re*

*Cronkleton*, 18 B.R. 792, 793 (Bankr. S.D. Ohio 1982); and *In re Correa*, 15 B.R. 195, 197

(Bankr. D. Md. 1981).


### HIGHLAND UNION BANK'S CLAIM OF SECURITY INTEREST IN DEBTOR'S PARTNERSHIP INTEREST

The Debtor's original schedules listed an installment obligation to HUB as an

unsecured obligation.  That bank filed three proofs of claim in the case on June 15, 2012.  In

those claims the bank asserted that all three obligations owed to it, the first mortgage loan, the

equity line loan, and the installment loan were all secured by an assignment by the Debtor of her

interest in a partnership known as Kingsport Ocean Club.  After those claims were filed, the

Debtor amended Schedules D and F to move the installment loan from Schedule F to Schedule D

with the indication that such obligation was secured by the assignment of the partnership

interest.  She did not, however, make any change in the indicated collateral for the two mortgage

obligations owing to the bank.  The Trustee has filed objections to the bank's proofs of claim

challenging the effectiveness of the purported assignment(s) of the partnership interest to the

bank, but the Court does not believe that it is necessary to rule on those objections in order to

rule upon the motion to dismiss on eligibility grounds.  Generally speaking, the Court must

13

evaluate a bankruptcy debtor's unsecured debt for the purpose of § 109(e) on the basis of that

debtor's schedules, assuming that they are filed in good faith. The Debtor has taken the

consistent position that the mortgage loans owing to HUB are only secured by the deeds of trust

upon the three real estate parcels which she owns with her husband. The Court assumes

therefore that the Debtor's amendment to Schedule D to reflect the partnership assignment as

only applying to the installment loan and not likewise to the mortgage loans was intentional on

her part. As previously noted, the burden of proof on the issue of the total amount of unsecured

debt rests upon the Debtor. Accordingly, the Court will make its ruling on the basis of the

Debtor's representations rather than the filings made by the bank.


THE EQUITABLE LIFE INSURANCE SOCIETY POLICY

In its proofs of claim HUB also claimed a security interest in a life insurance

policy upon the life of Mr. Mitchell. No such policy is included in Schedule B and although the

assignment form for it is signed by both Mr. and Mrs. Mitchell, only Mr. Mitchell's signature is

notarized. Accordingly, the Court assumes that such policy, if in force, is owned by the insured,

Mr. Mitchell. There is case authority holding that for the purpose of determining eligibility

under § 109(e) with respect to the amount of unsecured debt the proper inquiry is whether a debt

is secured or not, without regard to whether the collateral is owned by the bankruptcy debtor or

some other party. *In re Belknap*, 174 B.R. 182 (Bankr. W.D.N.Y. 1994), *In re Gorman*, 58 B.R.

372 (Bankr. E.D.N.Y. 1986), and *Branch Banking & Trust Co. v. Russell*, 188 B.R. 542

(E.D.N.C. 1995) (debt secured by assets of corporation wholly owned by debtors). Not

surprisingly there is also case authority to the contrary. *In re Tomlinson*, 116 B.R. 80 (Bankr.

14

E.D. Mich. 1990), and *In re Lower*, 311 B.R. 888 (Bankr. D. Colo. 2004) (debt owned by

debtor's wholly owned corporation). *Collier* declines to take sides, simply stating that "[c]ourts

have disagreed on whether a debt is deemed secured for purposes of section 109(e) if it is

secured by property other than property of the estate." 2 *Collier on Bankruptcy* ¶ 109.06[2][d], at

p. 109-44 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). There appears to be no

decision of the Fourth Circuit Court of Appeals precisely on point, but the logic of its decision in

*Balbus* would appear to suggest that only collateral in which the bankruptcy debtor has an

interest should be taken into account in determining to what extent a debt is unsecured for the

purpose of determining Chapter 13 eligibility. To be more specific, § 506(a) is by its terms

applicable to the determination of the secured portion of a claim "secured by a lien on property

in which the estate has an interest." Clearly the bankruptcy estate in this case has no interest

under Virginia law in a life insurance policy owned by Mr. Mitchell upon his own life. "[I]f the

estate has no interest in the nonfiling spouse's collateral, the claim would be unsecured under §

506(a) and unsecured for eligibility purposes." Keith M. Lundin & William H. Brown, *Chapter

13 Bankruptcy*, *4th Edition*, § 18.1, at ¶ 2, Sec. Rev. Mar. 6, 2009, www.Ch13online.com. The

Bankruptcy Court for the Eastern District of Virginia dealt with the application of § 506(a) in the

case of *In re Lane*, 215 B.R. 810 (Bankr. E.D. Va. 1997), in which the debtor was the sole

owner of a corporation that owned, among other things, two trailers and a tractor. These items

secured the payment of obligations on which she was personally liable. The debtor proposed a

plan in which she treated the obligations as secured. The court held that "the Debtor has no

other interest in the vehicles, thus precluding her from treating the Creditors as secured under her

plan." *Id.* at 814. Consistent with this view, on appeal the District Court affirmed the

Bankruptcy Court's decision that a debt cannot be considered secured when the security is not

property of the estate. *IRS v. Wingfield* (*In re Wingfield*), 284 B.R. 787, 790 (E.D. Va. 2002).

This case concerned an IRS lien on a 401(k) account. The court found that because the 401(k)

plan account was not property of the estate, the IRS could not be treated as secured. *Id.*

Under the facts of this case, there is one other ground that the existence and cash

value, if any, of this policy cannot be considered as security for HUB's loans. There is no

evidence before the Court as to the value of such policy. Because, as previously explained, the

Debtor has the burden of proof on how much of her undersecured debt is unsecured, any failure

of proof as to such issue must be charged against the Debtor.

CONSIDERATION OF DEBTOR'S CLASSIFICATION OF JOHNSON COUNTY BANK
DEBT AS CONTINGENT AND UNLIQUIDATED

In both the original and amended versions of Schedule D the Debtor represented

that her obligation to JCB was both contingent and unliquidated. With respect to the first of

those classifications, a careful examination of the copy of the obligation attached as an exhibit to

the bank's proof of claim indicates no apparent basis to suggest that the Debtor's liability to the

bank is contingent on anything. The only basis offered by Debtor's counsel at the January 9th

hearing was the asserted need for a demand for payment. Even if, for the sake of argument, the

absence of a pre-petition demand for payment upon a demand note might be considered to make

the obligation contingent, that certainly cannot reasonably be asserted to be applicable to an

obligation like the JCB note which provides for its payment in monthly installments

commencing long before the obligor's bankruptcy filing. "In deciding whether a claim is

noncontingent, and therefore counted toward the debt limits, courts have generally ruled that if a

16

debt does not come into existence until the occurrence of a future event, the debt is contingent." *Collier* ¶ 109.06[2][b], at p. 109-41.  An often used example of a contingent debt is a guaranty. *See id.* at 109-42.  "Contract claims against the debtor other than guaranties are generally held to be noncontingent debts for Chapter 13 eligibility purposes. . . .  Debts based on promissory notes or marketplace loan agreements typically are not contingent because the debtor's liability is fixed by contract from the inception and is not dependent on any future event other than the passage of time."  Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, *4th Edition*, § 15.4, at ¶ 1, Sec. Rev. June 11, 2004, www.Ch13online.com.  The District Court for this judicial district has made the legal test on this point clear - to be contingent within the meaning of the statute the obligation to pay must be contingent on the happening of "'an extrinsic event or occurrence . . . reasonably contemplated by the debtor and the creditor'" which has not taken place prior to the bankruptcy filing. *Brockenbrough v. Commissioner, I.R.S.*, 61 B.R. 685, 686 (W.D. Va. 1986) (quoting *In Re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980)).

The second of these classifications - the debt's liquidated or unliquidated nature - is a subject often considered by bankruptcy and appellate courts.  Contractual obligations for the repayment of money which are evidenced by notes containing the original amount of the obligation, its applicable interest rate and the other agreed terms of the debt repayment agreement are nearly always regarded as liquidated debts as they are susceptible of prompt determination.  *See, e.g., In re Sappah*, 2012 WL 6139644 at *1 ("a debt is liquidated if the amount of the debt is easily ascertainable using a simple mathematical calculation"); *Collier* ¶ 109.06[2][c] at p. 109-42 ("courts have generally held that a debt is liquidated if its amount is

17

readily determinable by reference to an agreement or by a simple computation"). An often

expressed distinction is that contractual obligations are ones which by nature are "liquidated"

debts while tort claims which have not been reduced to a jury verdict or judgment are considered

to be "unliquidated." *See In re Sylvester*, 19 B.R. 671, 673 (B.A.P. 9th Cir. Cal. 1982)[6]; *In re*

*Sappah*, 2012 WL 6139644 at *5. In this case the Debtor scheduled her debt to JCB in both

versions of Schedule D as being $323,853 which on the most basic common sense level does not

look like a debt which the Debtor truly regarded as "unliquidated." The bank on May 22, 2012

filed its proof of claim in the amount of $327,876.47, a figure which is even less suggestive of an

"unliquidated" obligation. More than six months have passed since the filing of that proof of

claim and although the Debtor has filed objections to various other claims filed in this case, she

has filed no challenge to JCB's claim. The Court concludes that under these facts there is no

legitimate basis on which to base a contention that the Debtor's obligation to that bank is either

contingent or unliquidated. "In determining whether the amount owed is easily ascertainable,

such that the debt is liquidated, it is enough that a minimum claim amount can be easily

determined." *In re Sappah*, 2012 WL 6139644 at *5. In its analysis the Court will utilize the

lower amount scheduled by the Debtor as that would appear to be a "minimum claim amount."

---

[6] This approach was adopted by Judge Tice of the Eastern District of Virginia
Bankruptcy Court when he determined that two debtors were ineligible to proceed in Chapter 13
in the case of *In re Claypool*, 142 B.R. 753 (Bankr. E.D. Va. 1990). In *Claypool* the debtors
listed debts of a corporation but disputed their personal liability on the debts. They argued that
because they disputed the debts, the debts should not count towards the § 109(e) limitation. In
support of this argument the debtors, like the Debtor in the case before this Court, relied heavily
on one case, *In re Pearson*, 773 F.2d 751 (6th Cir. Mich. 1985). The court in *Claypool* found
that *Pearson* determined the claim at issue was unliquidated at filing and became liquidated after
filing. "*Pearson* does not stand for the proposition that a liquidated *but disputed* claim may be
excluded from computation under § 109(e), and it is inapplicable here." *Id.* at 754.

18

AMENDMENT OF SCHEDULES

The Debtor asserts that this Court ought to make its eligibility determination based on the amended schedules that she filed. This contention appears to have been recently rejected in a ruling from the Court of Appeals for the Ninth Circuit which states, "We now simply and explicitly state the rule for determining Chapter 13 eligibility under § 109(e) to be that eligibility should normally be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith." *Scovis*, 249 F.3d at 982. In that case the debtors filed an Amended Schedule F which removed three creditors and reduced the overall general unsecured debt. The court found that the eligibility determination is to be made without reference to the amended schedules as long as the original schedules have been filed in good faith. *Id.* at 982.

On the other hand, Bankruptcy Rule 1009(a) expressly authorizes a bankruptcy debtor to amend his or her schedules "as a matter of course at any time before the case is closed." This Court is sympathetic to the proposition that amended schedules which correct some factual error made in the original schedules ought to serve as the basis upon which the eligibility determination should to be made. For example, if as the result of an undetected clerical error a debt which was intended to be listed as $30,000 was inadvertently shown as $300,000, the Court's decision ought to be made upon the actual facts represented in the amended and corrected schedules. In this case, the Debtor in her original Schedule F appears to have incorrectly listed the installment loan owing to HUB as unsecured when in fact it is, according to the amended Schedule D, secured by an assignment of a partnership interest owned by her. This amendment seems appropriate. The Court must make a distinction, however,

19

between an amendment to set forth the true facts of a case and one which seeks to alter a

representation intentionally made in the original schedules for a tactical litigation purpose, such

as asserting that a debt originally  represented as due and owing in an amount set forth in the

original schedule is now claimed to be disputed, unliquidated and contingent.  That is simply an

attempt to change a legal position which is belatedly believed to be disadvantageous, not to

correct an erroneous factual representation. The Court doubts that the right to amend goes that

far.

It is not necessary, however, for the Court to make a definitive ruling on this

question here because under either the original or amended schedules, the Debtor is over the

unsecured debt limit contained in § 109(e).


### EFFECT OF CREDITOR'S FAILURE TO FILE PROOF OF CLAIM OR WITHDRAWAL OF CLAIM PREVIOUSLY ALLOWED

The Debtor asserts that the Court ought to disregard for the purpose of

determining Chapter 13 eligibility any unsecured debt for which the creditor has not filed a proof

of claim or has withdrawn, as the Jenkins have done, a previously allowed claim.  She has

produced no authority supporting this contention and for good reason.  The critical test under the

statute is how much unsecured debt the Chapter 13 debtor owes on the filing date.  Whether an

unsecured creditor bothers to file a claim in the case or even withdraws a claim which has

previously been allowed is not relevant to that determination.

DECISION

Under both versions of Schedule D, as adjusted for the lower amount actually

claimed by the creditor, the Debtor admittedly owed no less than $323,853 in unsecured debt to

JCB on the petition date.  This debt was liquidated, undisputed and not contingent.  According to

her original Schedules D, E and F, she also owed as of that date other unsecured debt of $38,326,

$26,373, and $64,582.73 ($26,082.73 if reduced by the debts scheduled as owing to Kreger and

Jenkins), respectively, making an aggregate total (including the JCB debt) of $453,134.73

($414,634.73 if reduced by the Kreger and Jenkins obligations).  According to the amended

versions of those same schedules, the Debtor owed on the petition date other unsecured debt in

the amounts of $362,179, $5,320, and $5,074.73 respectively, even excluding the family debts

owing to Ms. Kreger and Mr. and Mrs. Jenkins which the Debtor now asserts are barred by the

applicable statute of limitations.[7]  The aggregate total (again including the JCB debt but

---

[7]  In a decision that considered the effect of a debt in dispute based on the affirmative
defense of statute of limitations, the Bankruptcy Appellate Panel of the Ninth Circuit held,
"From the record now before us, it appears that many of the claimants will readily admit that
their claims have been barred by the statute of limitations.  Accordingly, it appears that only the
briefest of hearings will be needed.  Since the investors' claims are capable of ready
determination and computation, they are liquidated for purposes of 11 U.S.C. § 109(e)."  *In re
Loya*, 123 B.R. 338, 341 (B.A.P. 9th Cir. Cal. 1991).  Accordingly, it concluded that because
"the amount of the liquidated debt owed to many of the [claimants] may be zero, the debtor may
have less than $100,000 [the then statutory maximum amount] in unsecured, noncontingent,
liquidated debts."  *Id.*  In contrast to Loya, the court in the case of *In re Marrama* concluded,
with regard to the statute of limitations defense, that "a defense to a claim does not reduce the
claim at the time a court is considering the claim."  345 B.R. 458, 471 (Bankr. D. Mass. 2006).
This decision is an accord with *In re Crescenzi*, 69 B.R. 64 (S.D.N.Y. 1986), which observed
that "[t]he majority of courts considering the question have held that merely because a debtor
disputes a debt, or has potential defenses or counterclaims that might reduce the creditors' actual
collection, the debt is not thereby rendered 'contingent' or 'unliquidated.'" *Id.* at 65.  *See also In
re Albano*, 55 B.R. 363 (N.D. Ill. 1985); *In re Vaughan*, 36 B.R. 935 (N.D. Ala. 1984); and *In re
De Brunner*, 22 B.R. 36 (Bankr. D. Nev. 1982).

excluding the Kreger and Jenkins obligations) of unsecured debt determined according to the amended schedules is $372,573.73. Under either version the Debtor's unsecured debt exceeds the § 109(e) limit effective in 2012 when this case was filed of $360,475. In making this decision the Court acknowledges some reservations about the facts that (I) it results in the second mortgage to HUB being treated as unsecured debt when the Debtor's Amended Plan proposes to pay such mortgage debt in full from the proceeds of the sale of the Cabin, and (ii) further treats as unsecured debt the undersecured portion of the first mortgage resulting from taking into account the priority lien of the delinquent real estate taxes against the residence property which under such Plan the Debtor proposes to pay in full according to the terms of the modification agreement reached with HUB with respect to that obligation. The Court concludes, however, that its decision necessarily follows from the language of the statute and the Fourth Circuit's decision in *Balbus* and simply represents an illustration of the fact of life that sometimes the application of the law to a particular factual situation can yield a result which may seem incongruous. Accordingly, unless the Debtor elects to convert her case to a chapter of the Code for which she is eligible for relief, the Trustee's motion to dismiss must be granted.

An Order in accordance with this Memorandum Decision will be entered contemporaneously herewith.

Decided this 30th day of January, 2013.

William F. Stone, Jr.

UNITED STATES BANKRUPTCY JUDGE